ANNAPOLIS, WASHINGTON and BALTIMORE RAIL-
ROAD CO. *vs*. STATE use of CLARA E. HICKOX.

*Accident at Private Railway Crossing in the Country—Contributory Negligence—Costs.*

Plaintiff's deceased while driving across railway tracks at a private crossing in the country, in broad daylight, was struck by a train and killed. He was well acquainted with the crossing and with the time of the passing of trains, and if he had looked and listened when near the crossing he could have seen and heard the train in time to avoid injury. *Held*, that the contributory negligence of the deceased was such as to prevent a recovery of damages for his death.

When an action has been brought in the name of an infant, but not by next friend as should have been done, and a judgment for the plaintiff is reversed on appeal, a judgment for costs cannot be entered against the infant.

*Decided December 21st, 1906.*

Appeal from the Circuit Court for Anne Arundel County (REVELL and THOMAS, JJ.)

The cause was argued before McSHERRY, C. J., BOYD, PEARCE, SCHMUCKER, JONES and BURKE, JJ.

*Jesse Slingluff* (with whom were *Frank Gosnell* and *Robert Moss* on the brief), for the appellant.

*A. T. Brady*, for the appellee.

BOYD, J., delivered the opinion of the Court.

This is an appeal from a judgment against the appellant for damages sustained by one of the equitable plaintiffs by reason of the death of her father, Clayton E. Hickox, alleged to have been caused by the negligence of the agents of the railroad company. The suit was brought for the use of Mrs. Gould and Clara E. Hickox, children of the deceased, but the jury

was instructed that there could be no recovery by Mrs. Gould and the only damages assessed were in favor of the other daughter, who was under age at the time of the death of her father.    Mr. Hickox was killed on a private crossing leading to his home, several hundred yards west of Camp Parole, a station on the railroad.    Other questions were presented by the prayers but in view of the conclusion we have reached, it will only be necessary to consider that of the contributory negligence of the deceased.

Mr. Hickox's residence was seven or eight hundred feet from the railroad and he was familiar with the running of the trains on it.    His farm was about two miles from Annapolis and he had driven his son-in-law there, and had gone after him in the evening, nearly every day for three months before the accident.    With the exception of a short time, he had lived on that farm a number of years.    He was injured on December 30th, 1904, and died in a short time.    He was driving from Annapolis when the accident occurred and was struck by a regular passenger train which left there at 8.43 A. M.    His son-in-law testified that he "was killed at about 8:45 in the morning," (referring doubtless to the time of the accident), and the evidence of the train men shows that it was running on schedule time.    The county road runs close to and parallel with the railroad near Camp Parole, and is about thirty-five or forty feet from it where the private road, leading to the Hickox place, leaves it.    The only witness to the accident, excepting the engineer, was a colored girl named Lulu Queen who was going from Mr. Hickox's place in the direction of the railroad.    She testified that "Just as he left the county road he stopped and looked out — looked up and down" —on cross examination she said "just as he turned in, he stopped, looked and listened."    When asked whether he did so when he got to the track she said, "No, sir, he didn't do it when he got to the track," and repeated several times that it was "at the instant" he turned in the road he stopped and looked.    The engineer said "the first I saw was a team coming across with a horse, and I looked round and saw the

horse galloping across the track.   I reached in and grabbed the air but it struck the buggy between the two wheels." He also testified that he was about fifteen or twenty yards away when he first saw the horse and that he did everything he could to avoid the accident.   From the point where Mr. Hickox turned into the private road he could ordinarily have seen down the railroad some distance, in the direction of Annapolis, but the plaintiffs' evidence was to the effect that there was a number of cross ties piled between the county road and the railroad, which obstructed his view.   After passing the cross-ties, and before getting on the railroad, he could have seen at least as far as Camp Parole station, which was variously stated by the witnesses to be two or three hundred yards, but the superintendent of the company testified that it was ten hundred and eighty feet from the station to the private crossing, by actual measurement.   The train was not scheduled to stop at Camp Parole and did not that morning—only stopping there to let passengers off who had by mistake taken it, and it was running thirty-five or more miles an hour.   There was testimony on the part of the plaintiffs tending to show that it was customary for all trains to blow a whistle at the crossing, and that it was not done the morning of the accident.   That was denied by the witnesses for the defendant— several engineers and conductors and the superintendent testifying that no such signal was ever given for the crossing, but stating that the whistle was always blown for Camp Parole station, whether the train was to stop there or not.   It is altogether probable, therefore, that the witnesses who were in the habit of hearing the whistle for Camp Parole supposed it was for the crossing.   Indeed that might be said to have been conclusively shown, when the evidence is critically examined.   Mr. Hardesty, a witness for the plaintiff, who lived about two hundred yards east of the station, said it was the custom of the railroad company in passing his place to blow a whistle.   There is no whistling post between that point and the Hickox crossing, and the defendant's witnesses show that it was customary to blow the whistle for Camp Parole

somewhere about that point.    The conductor testified that the engineer running the engine which struck Mr. Hickox usually blew three or four hundred yards east of the station, and the engineer who was called by both sides, testified that he blew the whistle that morning about three hundred yards from the station.    It would be difficult to reach any other conclusion from the evidence than that the custom was only to blow the whistle for the station, and the statements of the witnesses for the plaintiff that it was customary to blow "for the station and this crossing" does not necessarily mean that it was the custom to blow twice.    As the railroad company was under no obligation to give that signal for private crossing, *Pumphrey's case*, 72 Md. 85, the omission to blow the whistle for the station would not have been evidence of negligence.    The accustomed places to sound the whistle for the station were at least seventeen or eighteen hundred feet from the crossing, and the case of *Phila. & Balto. R. R. Co.* v. *Holden*, 93 Md. 417, would be conclusive of that question—the only difference between the cases being that in the latter the whistling post was distant nearly two thousand feet from the point of the accident, while in this case the whistle was usually blown seventeen or eighteen hundred feet from the crossing.    It was there held that "the failure of a railroad company to give the required signal at a public road crossing about 2000 feet distant from a private crossing is not evidence of negligence, in an action by a party to recover damages for an injury inflicted at such private crossing where the company is under no obligation to give a signal."

But without determining that it would be evidence of negligence on the part of the defendant, if we assume that some of the witnesses of the plaintiff did mean to say that another such signal was usually given between the station and the private crossing, the failure to give it on this occasion, if that be also conceded, could not relieve the plaintiff from the contributory negligence of the deceased.    The engineer and fireman both testified that the latter was ringing the bell as he passed the station, and that is not *in terms* denied by the

plaintiff's witnesses. Although some of them testified that they did not hear *any* signal, they were not asked as to a bell, and invariably spoke of the whistle, excepting one who said he heard no bell, but he was then speaking of the crossing. But regardless of that, there was no evidence whatever to show that Mr. Hickox was misled by the failure of the engineer to blow the whistle—indeed there was not a particle of evidence to show where the whistle was usually sounded, if it ever was, between the station and the crossing. It is difficult to understand how any one who was not deaf (and there is nothing to show that the deceased was) could have failed to hear the train running thirty-five or forty miles an hour, at such a place, if he had listened. His familiarity with the road was such as to require us to impute to him knowledge of the fact that a train was about due. His daughter, who was then sick in bed at his house, was familiar with that train and any one living as near the railroad as he did, and especially one accustomed to cross the tracks as frequently as he did, must have known it was due. Indeed the plaintiffs mainly relied on the failure of the company's agents to sound the whistle which they claimed was customary, as evidence of negligence, and unless the deceased was aware of the time the train was due, the plaintiffs could not contend he was misled by the absence of the usual signal, and there could be no other possible ground upon which such evidence was relevant, for as we have seen, the company was under no obligation to give signals at that crossing. If he could see down the track from the point where he "stopped, looked and listened," and did not see or hear the train, it must have been because there was no train close enough to be seen or heard, and if by reason of the obstruction of the cross-ties he could not see down the track, he was required to exercise care when he got nearer the track, where he could see and certainly could have heard the train coming, if he was listening. For it is no excuse for one not to stop, look and listen when he is near the track because he did so further away, at a point where he could not see, if he looked, and according to the plaintiffs'

contention could not hear, if he listened. If his view was obstructed, and the sound interfered with, it made it all the more important for him to stop again. There was no difficulty in seeing down the road to Camp Parole station, after he reached a point about fifteen feet from the track. The witnesses differ somewhat as to that distance, between the track and the pile of cross-ties, but the lowest put it at ten or twelve feet, and one as high as twenty-five feet. Lulu Queen, the witness to the accident, said the cross-ties were five or six yards from the track. Even if they were only ten or twelve feet away, if up to that point they obstructed the view from the private road, it was the duty of the deceased to again stop, look and listen for the train, which he had reason to expect.

In *Hatcher* v. *McDermot*, 103 Md. 78, we held that the plaintiff was guilty of contributory negligence for crossing an electric railway on a public crossing without having again stopped, looked and listened for a car, after he left a point about one hundred and thirty feet distant from the crossing, where he did stop, look and listen, but where his view was obstructed to some extent. In *Meidling* v. *United Ry. Co.*, 97 Md. 76, we quoted with approval from *Keenan's case*, 202 Pa. 107, where it was held to be the duty of the plaintiff "to continue to look until the track is reached," and that Court said, in speaking of the contributory negligence of the plaintiff in walking his horse across the track without again looking for a car, after having looked at a point thirty-five feet from the track; "But his misfortune is that he was careful but for an instant, when he should have continued to be watchful until the track—the real point of danger—was reached." This Court has over and over again said that if the view be obstructed it is the duty of the traveller to stop, look and listen before attempting to cross. *Price's case*, 87 Md. 188; *Watson's case*, 91 Md. 355; *Holden's case*, 93 Md. 417; *Manfuso's case*, 102 Md. 157, and many others cited in them. It had held in a number of cases that it was the duty of a person about to cross the track of a railroad to "look and listen" for approaching trains, but this Court did not in the earlier cases adopt the

view that it was his duty to *stop*, look and listen.    That doctrine was, however, finally adopted in a case where "the track in both directions is not fully in view in the immediate approach to the point of intersection of the road;" and it was held that in such case "due care would require that the party wishing to cross the railroad track should stop, look and listen before attempting to cross."    *Hogeland's case,* 66 Md. 149. It was said in that case that such rule was necessary for the safety of persons on the trains, as well as for those travelling on the public roads and that it ought not to be relaxed.

In this case the deceased neglected such precautions as the law required of him, and it should have been withdrawn from the jury on that ground, even if it be conceded that there was negligence on the part of the defendant, which it would be difficult to do.    He undoubtedly had the opportunity to ascertain the approach of the train before going upon the track, and, if the evidence on the part of the plaintiff is correct that his view was obstructed when he turned into the private road, there was all the more necessity for caution before putting himself in the way of the train, for as was said of the plaintiff in *Holden's case, supra,* the deceased "was perfectly familiar with the crossing and knew or should have known the regular hours for running the trains."    The engineer said that the horse was galloping across the track.    That is not contradicted and probably explains the unfortunate occurrence.    It so often happens that persons in vehicles assume they can cross a track of a railroad before an approaching train reaches the crossing, and take the risk.    Mr. Hickox probably miscalculated the speed of the train, or relied too much on that of his horse, but, however that may be, it seems clear to us that it was the duty of the Court, under the authorities we have cited, and many others that could be to the same effect, to have granted the prayer offered by the defendant denying the right of the plaintiff to recover, on the ground of the contributory negligence of the deceased.    Having reached that conclusion it would be useless to discuss other questions.

We do not find from the record that the infant sued by her

next friend, and although it is too late after verdict to make the objection that the name of the *prochein ami* should have been inserted, (*Albert* v. *State*, 66 Md. 325), a judgment cannot be entered for costs against the infant, and of course cannot be against the State. She cannot recover costs from the appellant, but as a next friend should have been named to secure costs, we will only reverse the judgment without entering judgment for costs in this Court.

> *Judgment reversed, without awarding a new trial.*