## PENNSYLVANIA RAILROAD COMPANY *v.* WILLIAM BREEDEN.

[No. 26, October Term, 1927.]

*Decided January 10th, 1928.*

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, DIGGES, PARKE, and SLOAN.

*Charles H. Carter,* with whom were *H. Courtenay Jenifer* and *Bernard Carter & Sons* on the brief, for the appellant.

*Edward H. Burke* and *Willis R. Jones,* with whom were *Bowie & Burke* on the brief, for the appellee.

92

PARKE, J., delivered the opinion of the Court.

This is an appeal from the judgment recovered by William Breeden, appellee, in his own right and for the use of his employer, Fred C. Peet, and his employer's insurance carrier, the State Accident Fund, against the Pennsylvania Railroad Company, appellant, for injuries received on October 24th, 1925, on a railroad crossing, in a collision between appellant's engine and a motor truck in which Breeden was being transported by the servant of his employer.

At the time of the accident Peet was engaged in the construction of a school building and two barns and a silo in the neighborhood of Riderwood, Baltimore County. He and his workmen lived in Baltimore and traveled south to their work along a public highway called Bellona Avenue to its intersection with Stevenson Lane, which crossed appellant's railway tracks a short distance west of the intersection and led to the property upon which the barns and silo were being built, and was in the vicinity of the school house.

For the purpose of description, it is sufficiently accurate to say that Bellona Avenue and the railway tracks of the appellant run north and south, and that Stevenson Lane, intersecting both the railway tracks and Bellona Avenue, extends east and west. The railway crossing is west of Bellona Avenue, and is about sixteen feet wide, with planks on either side of the rails of the double tracks, and stone and dirt between, so as to make the surface of the crossing level with the top of the rails. The approach to the crossing from the east is by an ascending grade. The railway tracks curve slightly to the east to the north of the crossing and slightly to the west to the south. On the north of Stevenson Lane, and close to the traveled way, is the southern end of a railway siding from five to six hundred feet in length and lying east of the railway, and gradually converging until it unites with the easternmost or north bound track of the main line. Between Bellona Avenue and the railway there are no buildings on the north side of Stevenson Lane to interfere with the view of the track to the north.

To the south of Stevenson Lane, and between Bellona Avenue and the railway, the view to the south is obstructed by gasoline tanks on the western edge of Bellona Avenue and then by a building, containing a post-office and store, until the line of its western wall is reached, but from that point to the railway, a distance of about twenty feet according to the plat, there is no other obstruction. In front of the building is a driveway, and, also, a county incandescent electric light on a pole forty feet east of the railway crossing. As the truck was traveling west from Bellona Avenue at the time of the accident and was struck by the engine on the western or south bound track, it is unnecessary to go further into the conditions south of the lane or west of the railway, except to note that a short distance below Stevenson Lane a siding left the west or southbound main track and extended northwestwardly across Stevenson Lane for a short distance to serve a coal yard north of the lane.

On the morning of the accident, which occurred at about half past seven, the view of the railway to the north had been obstructed. Three or four freight box cars had been placed in the siding to the east of the railway, so that the nearest one to Stevenson Lane was five feet from the south end of the siding. In addition, a pile of lumber, twelve or fourteen feet square and twelve or fourteen feet high, was standing north of the lane, and about twelve or sixteen feet east of the freight cars. These two obstructions prevented any one traveling from Bellona Avenue along Stevenson Lane towards the crossing from seeing the approach of a south-bound train until the freight cars on the siding had been passed. The measurements of the surveyor show that at its southern end this siding is eleven feet and eleven inches from the main track, and this distance slowly decreases until, at two hundred and sixty-three feet, the distance apart is seven feet and six inches. The surveyor estimated the total length of the siding to be from five to six hundred feet. The railway is in the open country, the crossing is sixty-eight feet from the west side of Bellona Avenue, and north of Stevenson Lane and between the avenue and the railway tracks there are no

obstructions, so, whatever may be the visibility of the tracks to the north of the junction of the main track and this siding, the physical conditions and these measurements establish that the main tracks were visible for at least a distance of five or six hundred feet from any point in Stevenson Lane between the most western rail of the main tracks and the prolongation of the plane of the sides of the freight cars that projected over the west rails of the siding. As the west rail of the southern end of the siding is eleven feet and eleven inches from the east rail of the north-bound main track, there was a distance of about eleven feet in which a pedestrian approaching the railway crossing from the east would have an unobstructed view to the north of both tracks for this minimum distance. Since the gauge of the railway tracks is five feet nine inches on the crossing, and the distance between the main tracks is six feet nine inches, the pedestrian would have to go twelve feet and six inches further on the crossing before reaching the east rail of the south-bound track, and while traversing this distance he would have the same unobstructed view to the north of the tracks, so that, after passing the freight cars on the siding, a traveler on Stevenson Lane had a clear view of both tracks to the north of from five to six hundred feet for twenty-three feet and six inches before reaching the east rail of the south-bound track.

There is no definite testimony as to how far back of the front of the truck the seat of the cab was placed, but the colored man who was sitting in the back of the truck testified that he was twelve feet away from the front of the truck, and, even if the cab be assumed to be as far back as eight feet, the driver of the truck could have stopped near to the north-bound track, but in a position of absolute safety, and there would have been an unobstructed view of the track to the north for at least five or six hundred feet. Peet and Breeden both testified it was necessary to drive the truck upon the north-bound track before you could see the full distance either way, and then, according to Peet, you could see the track for one hundred or one hundred and fifty yards, and Breeden estimated this distance at one hundred yards. Peet

stated on cross-examination that his statement of the distance was a guess, and there is nothing in the record to indicate that Breeden either had any better basis for his opinion or any qualification to give it weight. But if their testimony be accepted as a fact instead of an inaccurate opinion, their conduct in attempting the crossing was thereby made the more culpable.

On the morning of the accident Peet, with William Breeden, William F. Kates, George Diven, and Joseph Wilson, drove his Ford truck along Bellona Avenue and into Stevenson Lane to a point beyond the electric light pole, and stopped from twenty to thirty feet from the north-bound railway track to let Peet and Diven get out, so that they could go back to Bellona Avenue and walk to the place where the school house was being built. Kates, who had been brought along for the purpose of driving the truck to Zell's property and bringing back an automobile in which some other workmen had earlier gone to work, took the driver's left-hand seat. Peet stood on the ground near Kates and gave him his instructions. Although the engine continued to run, it did not make enough noise to cause Peet to raise his voice. Breeden kept his seat in front to the right of the driver, and the third man left in the truck was Wilson, who sat astride a board seat in the end of the truck, facing to the north. Peet and Diven walked back toward Bellona Avenue, and saw nothing of the accident until they looked back after hearing the crash of the collision on the crossing. The three men in the truck were the only witnesses of the accident who testified. Kates was an experienced driver, and the truck was in excellent operating condition, with its brakes in good working order. The truck had a capacity of one ton, a commercial body and a covered top, with side curtains. The testimony is to the effect that the curtains were rolled, but this is immaterial, as the truck had a cab front, and the door on the right-hand side was open, as it would not stay shut and had been tied back. Peet had stopped the truck, to allow its occupants to separate, at a point where the view of trains approaching the crossing from either the north or the south was wholly

obstructed by the freight cars and the lumber pile to the north of Stevenson Lane, and the store and postoffice building to its south. Kates and Breeden were familiar with the crossing, having traveled over it seven or eight times in the course of their work on the Zell property. Kates drove upon the crossing without stopping, according to Breeden's testimony, stopping at the north-bound track, and then proceeding, according to Kates' version, with Wilson not having any knowledge on this subject; and the right front wheel of the truck was struck by a part of the engine extending beyond the east rail of the south-bound track. The engine was drawing an express train at rapid speed, and the sole negligence imputed to the railway company is a failure to give any signal from the train of its approach to the crossing. Whether the conduct of Breeden should preclude a recovery in the pending case on the ground of contributory negligence is an inquiry of secondary importance, that need not be further pursued, since the primary and controlling question is whether the record shows that the appellant was guilty of negligence in not giving a signal from the train before reaching the crossing.

The action here was brought upon the theory that the accident occurred at a public crossing, but the proof was to the contrary. Stevenson Lane is an ancient private entrance or way to the manor house of a tract of land that was formerly owned by the Stevenson family, and is now the property of Stanley Zell. The lane runs from the manor house, east and west, across appellant's railway at grade, to Bellona Avenue, a public highway, for over twelve hundred feet. For more than fifty years the railway company has maintained this crossing, as is commonly done for private railway crossings. East of the railway, and four hundred and twenty-nine feet from Bellona Avenue, a way known as the Rider Road extends southward from Stevenson Lane through the property of Harrison Rider until it enters the Joppa Road, a public road, which, running east and west, crosses the railway of the appellant about six hundred feet south of the crossing at Stevenson Lane, and is intersected by Bellona

Avenue. About twelve or fifteen years ago, a public way, called Thornton Road, was opened twelve hundred and sixty-three feet east of Bellona Avenue, and this new highway runs north and south and intersects Stevenson Lane and, further south, the Joppa Road.

The Rider Road and the portion of Stevenson Lane from the Rider Road east to the railroad have been macadamized by private parties, but the rest of the lane is a stone and dirt road. As the properties binding on Stevenson Lane and Rider Road were subdivided and improved by residences and places of business, the use of these ways increased through the enlarged number of owners or occupants of these portions of the original tracts, and of those having occasion to go to and from their several properties.

The evidence does not show any material increase in the use of that portion of Stevenson Lane to the west of the entrance of the Rider Road, but there has been an increase in the travel over the Rider Road and that section of Stevenson Lane which affords ingress and egress from the Rider Road over the railway crossing to Bellona Avenue. While this increase is appreciable, it is a difference in degree and not of right. With occasional and negligible exceptions, the user continues to be that of those who have acquired property rights along the Rider Road and the metaled western section of Stevenson Lane, and of others going to and from the respective properties and places of business of those whose properties are so located. The evidence shows conclusively that neither Stevenson Lane nor the Rider Road is a public highway. Neither has ever been formally dedicated and accepted as a public way, and there has never been any assumption of control, nor work, labor, care, or maintenance done or undertaken, by the public authorities. Further, the evidence is clear that those using the continuous metaled roadway formed by the Rider Road and the eastern section of Stevenson Lane are warned by a sign posted along the roadside that the way is a private road; that the continuity of user has been broken, from time to time, by the

temporary placing of gates and rails across the way; and that trucks owned by parties having their business located on Stevenson Lane have been denied the privilege of passage over the Rider Road. The mere fact that a private way is subsequently used by the public without objection from the owner will not convert it into a public way. But here the proof is that the public's user has been permissive and so interrupted that no continuous user for twenty years was established, and there is no public way by prescription. *Elliott on Roads and Streets* (3rd Ed.), secs. 5, 6, 194; *Day v. Allender,* 22 Md. 511, 525-528; *Oliver v. Hook,* 47 Md. 301, 311; *Kennedy v. Cumberland,* 65 Md. 514, 521; *State, use of James, v. Kent County,* 83 Md. 377, 381, 383; *Washburn on Easements* ((4th Ed.), p. 213.

All the proof on this subject was that of the appellee, as the appellant offered none at the close of appellee's case. The county surveyor's testimony was that the Stevenson Lane railway crossing was a private one; and so was the evidence of Thomas G. Harrington, who kept the post-office and small store south of the lane and near the crossing, and who had lived in the neighborhood for eight years. The evidence further shows that it was not the custom for the appellant's trains to give any signal of their approach to this crossing. In Peet's cross-examination he spoke of it as the private crossing, and the appellant had set up, before the accident, to the south of Stevenson Lane, near both the railway and the roadway, a railway sign post carrying the warning "No Thoroughfare. Private Property. All persons Warned Against Trespassing Under Penalty." A similar sign stood on the west side of the railway and to the north of Stevenson Lane.

The warning thus set up was a plain and unmistakable notice that the roadway over the track was not a public crossing. The fact that other forms of warning are used at private crossings is immaterial, if the words displayed on the sign at the crossing in question gave notice. "No Thoroughfare. Private Property" means no public way or highway.

There is, therefore, no foundation for appellees' contention that such a notice, set up as here, near a crossing in the angle formed by a road and the railway, does not refer to the traveled crossing of an open roadway *over* the railway tracks, but is confined in its application to forbidding a longitudinal passage on a right of way, occupied by the rails and ties, where no vehicle can travel and every equestrian and pedestrian knows he should not.

The notice erected was a constant protest against the use of the crossing by the public. The appellant is seen not to have given permission to the public to use the crossing nor passively to have acquiesced in such a use, but to have objected in as obvious, continuous, practical, and reasonable a manner as could be devised. It was equivalent to serving a written notice to every traveler presenting himself at the crossing and using ordinary care. The fact that this notice was being disregarded did not, under the circumstances of this record, cast upon the appellant any greater degree of care. The authorities are not uniform, but *Elliott on Roads and Streets* (2nd Ed.), sec. 1019, concludes, "unless the company has done something to allure or invite travelers to cross, or has in some manner treated it as a public crossing, we are inclined to think the better rule is that they are, at the most, mere licensees to whom no duty of active vigilance is ordinarily due. Mere permission or passive acquiescence under ordinary circumstances does not constitute an invitation." The Maryland cases are in accord with this statement of the rule, and, under the circumstances of this record, the failure to ring the bell or blow the whistle of the engine as it approached the private crossing was not evidence of culpable negligence on the part of the appellant.

As was said in *Annapolis and Balto. Short Line R. Co. v. Pumphrey*, 72 Md. 82, at pp. 85, 86: "There is no statute of this state which imposes upon the appellant the duty to give signals of the approach of its trains to a private road or farm crossing. Numerous cases in this state and elsewhere have held that a failure on the part of a railroad com-

pany to give proper warnings of the approach of its trains to a public highway or thoroughfare crossing is an act of culpable negligence; but we are aware of no decision which fixes upon a defendant the like consequence for omitting such warnings as to farm crossings. On the contrary it has been determined twice by this court that no such obligation exists at all. *Phila., W. & B. R. Co. v. Fronk,* 67 Md. 339; *Northern Central Rwy. Co. v. State, use of Burns,* 54 Md. 113. Nor does the curve in the roadbed impose upon the company the duty of giving signals for such a crossing. The whistle and bell are intended to give warnings of danger. The more frequently they are employed the less valuable they become, because, if constantly resorted to and thus made familiar, they would be scarcely heeded or noticed, and they would soon cease to arrest attention. This is fully confirmed by the most ordinary observation. And they would have to be used almost uninterruptedly if their not being employed at every private crossing near a curve be treated as evidence of negligence. So the result of exacting such a duty would be that the only means of giving warnings of danger would be rendered practically valueless at the very localities where confessedly they ought to be employed. It follows that negligence cannot be ascribed to the appellant on this account." *Phila. & Balto. R. Co. v. Holden,* 93 Md. 417, 424, 425; *Annapolis, W. & B. R. Co. v. Hickox,* 104 Md. 659, 662; *Steil Brewing Co. v. Wash., B. & A. Elec. R. Co.,* 120 Md. 419, 423, 424.

The rule thus stated has not been relaxed. In *Balto. & O. R. Co. v. Welch,* 114 Md. 536, the accident happened on what was known as Wells Street at or near the foot of Byrd Street in Baltimore City. The entire bed of what was called Wells Street was then owned by the appellant, and occupied by its east and west bound main tracks and several switches. The appellee's son was fatally hurt by a backing tender of a locomotive on one of these switches. The trial court admitted testimony tending to show that persons had long been in the habit of walking along Wells Street and crossing the appe¹

lant's tracks in the vicinity of the place of the accident. On appeal, this tribunal said: "The court erred in admitting this testimony. The north and south streets in that section do not cross the property of the defendant which we have designated as Wells Street, nor is there any evidence of the existence of any *legalized public crossing* of the railroad tracks at or near the place where the boy was run over." Page 543. Neither the fact that the number of people entitled to use the private crossing increases, nor even the fact that the place is used repeatedly and frequently by those not entitled to use the private crossing, notwithstanding the notice of the signpost that it is not a highway, requires the railway company to have its train give signals of its approach. If the railway company is under no duty to give a warning to those who are entitled by contract or ownership to use a private crossing, no matter their number, it certainly can be under no obligation to employ a higher degree of care with respect to those who use the crossing without legal right or invitation of the railway. Such parties use the crossing with its concomitant risks and perils and, as a general rule, the duty owed them is no greater than to a trespasser. *Supra,* 3 *Elliott on Railroads* (3rd Ed.), sec. 1647; *Balto. & O. R. Co. v. Fronk,* 67 Md. 339; *Reidel v. Phila., W. & B. R. Co.,* 87 Md. 153, 156; *State v. Wash., B. & A. Elec. R. Co.,* 130 Md. 603, 615; *Chesapeake Co. v. Donahue,* 107 Md. 119, 128; *Maenner v. Carroll,* 46 Md. 193, 214; *McCreary v. Boston & M. Railroad,* 153 Mass. 300.

The appellee was on his way to work upon the premises of which Stevenson Lane was the entrance, and consequently the private crossing was properly open to him for that purpose, so he was rightfully entitled to cross, with ordinary care, the railway at the crossing, but, inasmuch as there is nothing in this record, such as acts, under the circumstances, equivalent to an invitation of the general public to use this crossing as a highway, or the failure of the appellant's servants to use due care upon the discovery of the peril of a traveler on the way, to take the cause out of the operation of the general rule, so frequently stated and applied by the

decisions of this court, that the railway is under no duty to give signals of the approach of its trains to a private crossing, the first prayer of the appellant taking the case from the jury on the ground that the appellee had not met the burden of establishing some negligent act or omission of the appellant, legally sufficient to carry the case to the jury, should have been granted. As was said by Judge Alvey: "All verdicts of juries must have rational support from the evidence in the cause; and where it is manifest to the court upon the plaintiff's own showing, and the uncontradicted evidence in the cause, that there is no rational ground upon which a verdict can be based for the plaintiff, it becomes the duty of the court to direct a verdict for the defendant." *Balto. & O. R. Co. v. State,* 69 Md. 551, 559.

As there is an absence of any ground for the plaintiff to recover, it is unnecessary to discuss the other questions relating to the rulings on the evidence and the other prayers, and the judgment will be reversed without directing a new trial.

*Judgment reversed, with costs, without awarding a new trial.*