**U.S.A.C. TRANSPORT, INC.**
v.
**BALTIMORE & OHIO RAILROAD CO.**
and Jonathon S. England and Andrew L. Devlin and Christian Heurich, Jr., and Taylor Lumber & Supply Corporation.

**BALTIMORE & OHIO RAILROAD CO.**
v.
**U.S.A.C. TRANSPORT, INC.**

Robert Z. OZMER to his own use and to the use of Service Fire Insurance Company of New York
v.
**BALTIMORE & OHIO RAILROAD CO.**
and Jonathon S. England, Andrew L. Devlin, Christian Heurich, Jr., and Taylor Lumber & Supply Corporation.

**BALTIMORE & OHIO RAILROAD CO.**
v.
Robert Z. OZMER.
Civ. Nos. 12323, 12844.

United States District Court
D. Maryland.
Oct. 29, 1962.

**816**

Thomas G. Andrew and Rollins, Smalkin, Weston & Andrew, Baltimore, Md., for U. S. A. C. Transport, Inc.

Charles C. Hartman, Jr., and Fell & Hartman, Annapolis, Md., and Thomas G. Andrew and Rollins, Smalkin, Weston & Andrew, Baltimore, Md., for Robert Z. Ozmer.

J. Sarsfield Sweeny and Hershey, Donaldson, Williams & Stanley, Baltimore, Md., for B & O Railroad Co.

James D. Peacock and Semmes, Bowen & Semmes, Baltimore, Md., for England, Devlin, Heurich and Taylor Lumber & Supply Corp.

THOMSEN, Chief Judge.

These actions, which were consolidated for trial and were heard together by the court without a jury, arise out of a collision between a B & O train and a tractor-trailer unit which had "hung up" on one of the outside rails at a grade crossing because of the road's steep approach to the tracks and the extremely low clearance of the trailer, only 12 inches above the ground. The claims of the two plaintiffs (U. S. A. C. Transport and Ozmer) against the B & O and the B & O's counterclaims raise questions as to the nature of the crossing, negligence, assumption of risk, contributory negli-

gence, and last clear chance. The complaints also charge negligence in the construction and upkeep of the crossing on the part of the individual owners and of the corporate lessee-occupier of the premises to which the road leads.

## Facts

The B & O tracks running west from Rockville, Maryland, curve gently to the right. Then, about 6,000 ft. (a little more than a mile) south of the Derwood crossing, where the collision occurred, they enter a long straight stretch running north past that crossing. There are two tracks, with trees and bushes on each side of the 66 ft. right-of-way; the northbound track is on the right, the east. Three roads cross this straight stretch at grade; the first crossing is a little more than 2,000 ft. after the end of the curve, the second (the Westmore crossing) nearly 2,000 ft. beyond the first, and the third (the Derwood crossing) about 2,000 ft. beyond the second. The first two are admittedly public crossings; the B & O contends that the third is a private crossing, but in its operations it treats the three alike, whistling for each. At the third crossing, with which we are concerned, cross-bar warning signs, with the legend "Railroad Crossing", such as are usually placed at public crossings, have been erected beside the road on each side of the tracks. No sign warning against trespassing or indicating that the crossing is private has been posted by the B & O anywhere along the road, which is a dirt road leading from the highway (Md. 355, old U.S. 240 to Frederick, just west of the tracks) east across the tracks to a 58 acre parcel of land owned by the individual defendants. Part of the 58 acres is leased to the corporate defendant for a sawmill and part to another company for a junk yard. The road is used by the public visiting either the sawmill or the junk yard in their own trucks and automobiles, as well as by the proprietors and employees of those enterprises.[1] There is no evidence when or by whom the dirt road involved in this case was first cut through, except that the crossing appears on a B & O plat dated 1918. Nor is there any evidence when or by whom the crossing (including particularly the badly worn macadam surface between the rails and on each side of the tracks) was constructed.

The corporate defendant (the Taylor Company), which operated the sawmill, owned a low-boy trailer, some 32 ft. long, with a clearance of 16 inches, which had apparently negotiated the crossing from time to time without difficulty; but there is no evidence that any trailer as long (35 ft.) and as low (12 inches above the ground) as plaintiff's trailer had ever used this crossing. I find that none of the defendants should have anticipated that such a vehicle would use the crossing. The Taylor Company employed Ozmer's brother-in-law (Slagle) as a truck driver and general handyman. Slagle also acted as night watchman and had an arrangement with the Taylor company whereby his house trailer, in which he and his family lived, was parked on the sawmill property. He was paid nothing extra for his services as a watchman, he paid no rent, and there was no adjustment in his salary when he moved to Rockville with his family some

1. The 58 acres were formerly part of a much larger tract owned by the Keys family, which extended west to the highway and south to a line beyond what is now the Westmore crossing. The B & O condemned its right-of-way across this large tract about 1869, pursuant to Ch. 70, sec. 2, of the Acts of 1865. See also Ch. 123, sec. 16, of the Acts of 1826. There is no evidence whether the dirt road which now crosses the railroad tracks was then in existence. On April 29, 1887, the B & O and the Keys family entered into an agreement which provided for the maintenance by the B & O of a "good and sufficient crossing from the Frederick Road to the lands of the said Chandler Keys and Angelina Keys". I find, however, that the crossing referred to in the agreement of 1887 was not the Derwood crossing involved in this case, but was probably a crossing nearer to the present Westmore crossing.

months after the accident. Ozmer had spent a night in his brother-in-law's trailer three or four months before May 1960, and had driven his automobile across the tracks at the Derwood crossing at least four times, without difficulty. He was familiar with its character, and must have noticed the fairly steep, short approach up to the tracks on both sides. There was no significant change in the condition of the crossing between the time of his former visit and the time of the accident.

Ozmer owned a White tractor, which cost $18,000 and which he had leased to U. S. A. C. Transport under an arrangement by which he was paid various amounts per mile, depending upon whether he was driving laden or unladen, and with or without a second driver. The parties treated four cents per mile as compensation for Ozmer's services as a driver, and the U. S. A. C. Transport does not deny that Ozmer was its servant for the purposes of this case, since he was driving the tractor he had leased to it, hauling one of its trailers. The trailer was about 35 ft. long, with four wheels on one axle at the rear. It was of the type generally used to haul automobiles, but without a superstructure. It had a clearance of only 12 inches; the law requires at least 11 inches.

Ozmer left Utica, Michigan, with two airplane engines loaded on the trailer, bound for Middle River, Maryland, and Wilmington, Delaware. About 3 p. m. on May 13 Ozmer arrived in the neighborhood of Frederick, Maryland, called the Martin Company, where the first engine was to be delivered, and was told that he could not reach Middle River in time to unload the engine that day but that it could be unloaded early the next morning. Ozmer then decided to depart from the direct route to Baltimore and Middle River and to spend the night with his brother-in-law, although he had a place to sleep in the tractor. Accordingly, he drove south on U.S. 240 to Rockville, then north on Md. 355 to the Derwood dirt road and east across the railroad tracks to his brother-in-law's trailer, which was parked some 200 yds. beyond the tracks. Ozmer had no difficulty negotiating the crossing from west to east.

Ozmer spent the night in Slagle's house trailer, and shortly before 6 a. m., daylight saving time, drove his tractor-trailer unit west toward the crossing. Slagle accompanied him, alighted, looked to be sure that no train was approaching, and signaled Ozmer to cross. Ozmer proceeded until the rear wheels of his tractor were on the outside rail of the southbound track, i. e. the westernmost rail, and the wheels at the rear end of the trailer were some distance east of the eastern rail of the northbound track, i. e. the easternmost rail. At that moment the unit "hung up" on the easternmost rail, and Ozmer was unable to obtain enough traction to move it although he attempted to go both forward and backward. Evidently the rear wheels of the trailer were at a steep point of the slope, within the 66 ft. right-of-way of the B & O.

Ozmer promptly got out, placed one lighted flare about 50 ft. south of the unit on a crosstie of the northbound track on the outer side of the inner rail, then placed the other lighted flare about 150 ft. north of the unit. He heard a train whistle, ran back past the crossing, picked up the flare which he had set on the crosstie of the northbound track, and ran south waving the flare over his head. The engineer says he was waving the flare up and down, but I find he was waving it horizontally. The difference is important, because to a railroad engineer horizontal waving means an emergency stop, vertical waving means caution, slow. The train, an 80-car freight train with a 4-unit diesel engine, passed Ozmer when he was 400 or 450 ft. from the crossing, struck the trailer and pushed the unit 8 car lengths, about 400 ft., down the tracks before stopping.

The accident happened in daylight, within a minute or two of 6 a. m., d. s. t., a few minutes before sunrise. On the weight of the evidence it was clear, with-

out fog and with little or no haze. It was possible for a person standing on or near the Derwood crossing to see a train coming around the bend a little over a mile away. It is doubtful whether it would have been possible for the engineer of a moving train to have distinguished this tractor-trailer with its load on the Derwood crossing from so great a distance.[2] I find from all the evidence that the engineer saw the truck before he reached the first crossing, although he could not tell whether it was moving until he looked a second time. He should have seen that the truck was still in the same position immediately after the train passed the first crossing.

The engineer admits seeing the flame of the flare as he entered the straight stretch more than a mile away. He testified that he thought at first there was a fire along the side of the right-of-way. Perhaps so, but it is evident from observing the engineer on the stand that his reactions are slow. The testimony of the fireman is also unsatisfactory. I find that both the engineer and the fireman saw the flame of the flare and should have recognized it for what it was no later than when they were passing the first crossing, 2,000 ft. after the train entered the straight stretch and 4,000 ft. from the third (Derwood) crossing. The engineer did not attempt to slow down until he was at or about the second crossing; indeed, it is probable that he continued to increase his speed (from 45 to 50 or 60 m. p. h.) as he customarily did coming out of the curve and entering the long straight stretch. The engineer testified that he first realized that the flame was from a flare when he was "in the neighborhood of" the second crossing, only 2,000 ft. from the third crossing, and that he made a service application of his brakes at that time.

I accept the testimony of the engineer that he made his service application of the brakes in the neighborhood of the second crossing. It is not clear whether it was a continuous full service application or a split reduction. The one would slow the train down more rapidly than the other.

The engineer does not say how far he was from the third crossing when he first made an emergency application of the brakes. The fireman says that the whistle was not blown for the third crossing because by that time they were abandoning the cab, having made an emergency application. If so, the emergency application was made shortly after the train passed the second crossing. Plaintiff's witnesses indicate that it was not made until later than that. One witness placed it only about 200 ft. from the crossing, but I find that it must have been made sooner, probably about 1,000 ft. plus or minus 250 ft. from the crossing.

It is not clear from the evidence within what distance the train could have been stopped by the application of the emergency brake initially or after an earlier service application. Too many factors are involved to permit a positive answer to this question.

The important ultimate finding is that if either the service application or the emergency application of the brakes had been made 500 to 600 ft. sooner than it was in fact made, the train would have been brought to a stop before striking the trailer.

\*

There is little dispute about the damages.

2. The tractor was painted white with blue lettering. The trailer was about 3 ft. high and was painted white. At the time of the accident two airplane engines were loaded on the trailer, with some space between them. One of the engines was painted blue and the other olive drab. Ozmer says that four amber lights on each side of the trailer were on, as well as his tail lights and his front lights but not his headlights. The engineer says that he did not see any of these lights. The law requires that they be burning during the hour before sunrise, and I find that they were burning, but it is understandable that because they were so near the ground the engineer would probably not have seen them from any considerable distance.

Repairs to the trailer cost $743.00, repairs to the two airplane engines, $17,-391.31, plus incidental expenses of $754.74, making the total damages in the U. S. A. C. Transport case $18,889.05.

■ Repairs to the tractor cost $3,-013.58, necessary trips from Ozmer's home in Tennessee to the repair shop cost $150.00, and damages to Ozmer's personal property in the tractor amounted to $200.00. The only dispute concerns loss of use of the tractor, which was not put to productive use until August 16. The intervening months are part of the most productive hauling period in the year. However, all the lost time is not properly chargeable to the accident; part was caused by delays of the insurance carrier, by a long testing period between the two periods in the shop, and by the fact that U. S. A. C. Transport had terminated Ozmer's employment, causing him to look for a new job. It seems fair to allow $40.00 a day for 60 days, a total of $2,400.00 for loss of use, making the total damages in Ozmer's case $5,-763.58, of which his insurance carrier is entitled to $2,763.58.

The damages to the B & O's engine and roadbed amounted to $5,435.44.

## Discussion

### I.

■ Plaintiffs' claims against the owners and the lessee-occupier of the sawmill property are so weak that plaintiff U. S. A. C. Transport agreed that its claim against them should be dismissed with prejudice. Plaintiff Ozmer was a licensee under the Maryland law: "A licensee is one privileged to enter anothers' land by virtue of the possessor's consent, for the licensee's own purposes." Peregoy v. Western Md. R. R. Co., 202 Md. 203, 207, 95 A.2d 867, 869. See also Restatement of the Law, Second, Torts, Tentative Draft No. 5, sec. 330. A licensee "must take the property as he finds it, the owner or occupant undertaking no duty to a visitor who comes for his own pleasure or convenience, except that, if he becomes aware of the li-censee's presence, the licensor must not injure him wilfully or entrap him. Brinkmeyer v. United Iron and Metal Co., 168 Md. 149, 177 A. 171," Peregoy v. Western Md. R. R. Co., supra. See also Carroll v. Spencer, 204 Md. 387, 104 A. 2d 628, 44 A.L.R.2d 1247; Restatement of the Law, Second, Torts, Tentative Draft No. 5, secs. 342, 343(a). Whether or not the owners or the lessee-occupier of the sawmill property owed any duty with respect to the crossing to a person visiting the property in a truck or an automobile, they had no reason to expect that plaintiff or anyone else would come onto the property with a trailer having a clearance of only 12 inches. The danger involved in hauling such a vehicle over the crossing was obvious and should have been known to Ozmer from his previous visit to the property several months before. He assumed whatever risk there was and, if there was any primary negligence on the part of anyone, he was guilty of contributory negligence.

### II.

The claims against the B & O and its counterclaims require fuller discussion. They turn principally on the nature of the crossing and the issue of last clear chance.

■ The B & O contends that the crossing was a private crossing, and that "Unless the company has done something to allure or invite travelers to cross, or has in some manner treated it as a public crossing", such travelers "are, at the most, mere licensees to whom no duty of active vigilance is ordinarily due", quoting from Penna. R. R. Co. v. Breeden, 154 Md. 91, 99, 140 A. 82, 86. Our case, however, is different from the Breeden case in material respects. In the Breeden case railroad sign posts had been erected carrying the warning "No Thoroughfare. Private Property. All Persons Warned against Trespassing under Penalty". There was no such warning in our case, but "Railroad Crossing" signs such as are often seen at public crossings. In the Breeden case it was

not customary for the trains to give any signal of their approach to the crossing. In our case they customarily give the same warning at all three crossings west of Rockville, two of which are admittedly public. In the Breeden case the Court could say: "The appellant is seen not to have given permission to the public to use the crossing nor passively to have acquiesced in such a use, but to have objected in as obvious, continuous, practical, and reasonable a manner as could be devised." Nothing like that can be said here. Our case is controlled by the statements of the Court of Appeals of Maryland in the recent case of Campbell v. Patton, 227 Md. 125, 140, 175 A.2d 761, 770, quoting from Baltimore & O. R. Co. v. Welch, 114 Md. 536, 80 A. 170, "that the duty of those in charge of moving railway trains to keep a look out for and exert care to avoid injuring persons at railway crossings and on public highways where such persons have a right to be, and may be expected to be found is entirely different from the care required of them in respect to the possible presence of trespassers on the railway tracks where, having no right to be, they are not expected to be found."

█ No duty on the part of the B & O to maintain or improve the crossing has been shown and, as we have seen, Ozmer assumed the risk of the condition of the crossing and was himself negligent in attempting to drive the low trailer over the crossing. Plaintiffs must therefore rely on last clear chance. When the train came around the curve 6,000 ft. away, the tractor-trailer was already in a position of peril from which Ozmer could not extricate it. If the B & O engineer was negligent in failing to stop the train in time to avoid the accident, his negligence was sequential and not concurrent. I find that the engineer was guilty of negligence in failing to apply his brakes

more promptly after he saw or should have seen and recognized the flare and after he saw or should have seen and realized that the trailer was stopped on the track. I further find that if he had applied his brakes when he should have applied them he would have stopped the train in time to have avoided the accident. Baltimore & O. R. R. Co. v. Leasure, 193 Md. 523, 534, 69 A.2d 248; Campbell v. Patton, supra, citing inter alia Miller v. Penna. R. R. Co., 106 U.S. App.D.C. 316, 272 F.2d 545, 546, and Penna. R. R. Co. v. Simmons, 159 Md. 114, 150 A. 263.[3] See also Miller v. Penna. R. R. Co., 102 U.S.App.D.C. 135, 251 F.2d 376, 378, 379.

█ Even if this were a case where the B & O could be held for negligence on the part of the engineer only after he actually saw the trailer in a position of peril, I would find the B & O liable under the last clear chance doctrine. The engineer saw both the trailer and the flame of the flare before he reached the first crossing. He should not have ignored those indications of danger and should not have continued to increase his speed; he should have applied his brakes not later than midway between the first and second crossings. By so doing he would have avoided the accident.

## Conclusion

Judgment will be entered in favor of U. S. A. C. Transport, Inc., against the B & O only in the amount of $18,889.05, and in favor of Ozmer against the B & O only in the amount of $5,763.58 of which $2,763.58 will be entered to the use of Service Fire Insurance Company of New York. Judgment will be entered against the B & O on its counterclaims. The costs will be divided, one-half to be paid by the B & O, one-quarter by Ozmer and one-quarter by the Insurance Company, in view of 28 U.S.C.A. § 1332(b).

3. The partial overruling of Penna. R. R. Co. v. Simmons by Martin v. Sweeney, 207 Md. 543, 552, 114 A.2d 825, affects only situations where the negligence is concurrent and not sequential. The portion quoted in Campbell v. Patton, a later case than Martin v. Sweeney, was not affected.